**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEON ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:11CV 1324 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Leon Anderson for Disability Insurance Benefits under Title II of the

Social Security Act, and Supplemental Security Income under Title XVI of the Act.  This case has

been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a

Brief in support of the Complaint.  (Doc. No. 13).  Defendant filed a Brief in Support of the

Answer.  (Doc. No. 18).

## Procedural History

On September 24, 2008, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on April 17, 2008.  (Tr. 177-22).  This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated May 20, 2010.  (Tr. 60-62, 65-71, 14-20).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on June 7, 2011. (Tr. 9, 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on May 6, 2010. (Tr. 27). Plaintiff was present and was represented by counsel. (Id.). Also present, by telephone, were medical expert Dr. Karl Leigh; and vocational expert Michelle Peters. (Id.).

Plaintiff's attorney made an opening statement, in which he indicated that plaintiff had a history of lung cancer, and had a tumor in his shoulder and in his right leg. (Tr. 31). Plaintiff's attorney stated that plaintiff had difficulty walking, standing, and using his dominant right arm. (Id.). Plaintiff's attorney indicated that the records from Barnes-Jewish Hospital supported plaintiff's complaints. (Tr. 32).

The ALJ questioned plaintiff, who testified that he last worked in September of 2007. (Tr. 30). Plaintiff stated that he completed eleventh grade, and then earned his GED in the Army. (Id.). Plaintiff testified that he received engineering training in the Army. (Id.).

Plaintiff stated that he was able to reach up overhead for a short period of time. (Tr. 32). Plaintiff testified that he was able to lift ten to fifteen pounds with his right arm, and fifteen to twenty pounds with his left arm. (Tr. 33).

Plaintiff stated that he had problems with both legs. (Id.). Plaintiff indicated that he had a blood clot removed from his left thigh, and he had a tumor in his right leg. (Tr. 33-34). Plaintiff testified that he was able to walk a couple of blocks before he experienced severe pain. (Tr. 34).

Plaintiff stated that he was in pain six to eight hours of an average twenty-four hour day. (Id.). Plaintiff testified that he was able to sit for one hour. (Id.). Plaintiff stated that he was also able to stand for one hour. (Id.). Plaintiff testified that he was not able to walk for one hour. (Id.).

Plaintiff stated that he was able to make fists with both hands, and had feeling in both hands. (Tr. 35). Plaintiff testified that he experienced some numbness and tingling in the right index finger and third finger. (Id.). Plaintiff stated that he was able to grasp and pull, even though he experienced numbness in his fingers. (Tr. 36).

Plaintiff testified that he would be able to push and pull a cart containing twenty pounds for a distance of twenty feet. (Id.). Plaintiff stated that he was able to carry ten to fifteen pounds a distance of the length of a courtroom. (Id.).

Plaintiff testified that he was able to pay attention and concentrate. (Tr. 37).

Plaintiff stated that he had difficulty breathing. (Id.). Plaintiff testified that he experienced shortness of breath after walking a couple blocks, or walking up many steps. (Id.). Plaintiff stated that he was able to walk up the seventeen steps to get to his home. (Tr. 38).

Plaintiff testified that he did not have a driver's license at the time of the hearing because his license was suspended due to his failure to pay insurance. (Id.). Plaintiff stated that he last drove a vehicle in 2007 or 2008. (Id.).

Plaintiff testified that he had problems with dust and mold. (Tr. 39).

Plaintiff stated that he had difficulty with light when he experienced headaches. (Id.). Plaintiff testified that he last went to the emergency room due to a headache in 2006 or 2007. (Id.).

Plaintiff stated that he received emergency room treatment in 2008 for a suspected blood clot in his thigh. (Tr. 39). Plaintiff testified that he was later diagnosed with lung cancer. (Tr. 40).

Plaintiff's attorney indicated that plaintiff's breathing issues did not prevent him from working. (Id.). Plaintiff's attorney argued that plaintiff was unable to work due to his inability to use his right side, and his headaches. (Id.).

The ALJ then examined the medical expert, Dr. Karl Leigh, who testified that he had reviewed plaintiff's file. (Id.). Dr. Leigh indicated that he had questions for plaintiff. (Tr. 41).

Dr. Leigh questioned plaintiff, who testified that he had a breathing machine at home that he used periodically to monitor his breathing level. (Id.). Plaintiff stated that he had not undergone breathing tests at a doctor's office recently. (Tr. 42).

Plaintiff testified that he was receiving treatment for pain in his back, as well as headaches, right shoulder pain, and neck pain. (Tr. 43).

Dr. Leigh then discussed plaintiff's medically determinable impairments. (Tr. 43). Dr. Leigh testified that plaintiff had non-small cell bronchogenic carcinoma[1] of the lungs, for which he underwent complete resection of his right upper lobe on June 17, 2008. (Id.). Dr. Leigh stated that on May 21, 2008, plaintiff underwent pulmonary function tests which were excellent. (Id.). Dr. Leigh indicated that plaintiff was in oxygen therapy for a matter of months, and was no longer on oxygen by February 6, 2009. (Id.). Dr. Leigh noted that plaintiff did not require chemotherapy or radiation therapy. (Id.).

Dr. Leigh testified that plaintiff complained of a mass near the right collar bone, which has

_____

[1]Lung cancer. Stedman's Medical Dictionary, 309 (28th Ed. 2006).

been designated as a lipoma,[2] or a benign type of fatty tumor. (Tr. 44). Dr. Leigh stated that this mass has been growing and was very tender in May of 2008, which was unusual for a lipoma. (Id.). Dr. Leigh testified that he saw no evidence that this mass or another mass on plaintiff's body were malignant or represented anything serious. (Id.).

Dr. Leigh stated that plaintiff was diagnosed with degenerative disc disease[3] of the cervical[4] spine, especially at C5 through C7, with documented decreased range of motion of the neck. (Id.). Dr. Leigh testified that there were also diagnoses of cervical spondylosis[5] and radiculitis[6] in the record. (Tr. 45). Dr. Leigh indicated that plaintiff received steroid injections in the cervical spine. (Id.).

Dr. Leigh testified that there was evidence of some decreased range of motion of the lumbar spine and both hips, which was not quantitative. (Id.). Dr. Leigh stated that plaintiff's straight leg raising was positive on the left, although he was not aware of any medically determinable impairment that would explain either the lumbar spine or the hips. (Id.). Dr. Leigh noted that there was a statement from a treating source from November of 2008, which indicated

---

[2]A benign neoplasm of adipose tissue, composed of mature fat cells. Stedman's at 1107.

[3]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[4]In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See Medical Information Systems for Lawyers, § 6:27.

[5]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1813.

[6]Disorder of the spinal nerve roots. Stedman's at 1622.

that plaintiff was not performing the stretching or range of motion exercises that had been prescribed for his right upper extremity discomfort. (Id.).

Dr. Leigh stated that plaintiff was prescribed Oxycontin[7] and Percocet[8] for pain. (Id.). Plaintiff testified that his doctors took him off these medications because they are narcotics. (Id.). Plaintiff stated that he was just taking Tylenol at the time of the hearing. (Tr. 46).

Dr. Leigh stated that plaintiff was also taking Hydrochlorothiazide[9] for high blood pressure. (Id.). Plaintiff testified that his blood pressure was "not that high." (Tr. 47).

Dr. Leigh concluded that he did not find any medically determinable impairment that would limit plaintiff to sitting, other than the decreased range of the lower spine. (Id.). Dr. Leigh noted that there was no medically determinable impairment causing plaintiff's decreased range of motion of the lower spine. (Id.). Dr. Leigh testified that it was his opinion that plaintiff's impairments did not meet or equal a listing. (Tr. 48). Dr. Leigh stated that plaintiff had the residual functional capacity to perform light work. (Id.). Dr. Leigh testified that plaintiff should avoid all hazardous unprotected heights; no climbing stairs; occasionally stoop, kneel, crouch, and crawl; occasionally reach overhead with the right upper extremity; avoid concentrated exposure to noxious odors, fumes, gases, dust, smoke, poor ventilation; avoid concentrated exposure to machinery with open, moving parts such as blades; and no commercial driving. (Id.).

---

[7]Oxycontin is indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. See Physician's Desk Reference, ("PDR"), 2590 (63rd Ed. 2009).

[8]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1127.

[9]Hydrochlorothiazide is indicated for the treatment of hypertension. See PDR at 643.

The ALJ next examined vocational expert Michelle Peters, who testified that all of plaintiff's past work was industry-specific and the skills were not transferable to lesser exertional limits. (Tr. 51).

The ALJ asked Ms. Peters to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: able to lift and carry ten to fifteen pounds occasionally with the right arm; lift and carry fifteen to twenty pounds occasionally with his left arm; lift and carry ten pounds frequently with both arms; able to sit and stand in one hour increments; able to sit for six hours out of an eight-hour day; able to stand and walk for six hours out of an eight-hour day; able to push and pull an unlimited amount; a sit/stand option should be made available; repetitive use of hand and foot controls; feeling and fingering frequently in the dominant right hand secondary to some perception of loss of sensation in the right index and third finger, which does not functionally prevent the lifting or carrying; repetitive feeling and fingering in the left hand; handling objects and reaching frequently, but only occasional overhead reaching with the right arm; never climb ladders, ropes, or scaffolds; repetitive climbing of ramps ands stairs; repetitive balancing; occasional stooping, kneeling, crouching, and crawling; avoid concentrated exposure to chemicals, dust, fumes, high humidity, and temperature extremes; avoid all exposure to unprotected heights and concentrated exposure to moving machinery; and no commercial driving. (Tr. 52-53). Ms. Peters testified that such a claimant would be unable to perform plaintiff's past relevant work. (Tr. 54). Ms. Peters stated that the individual could perform other work, such as hand packaging positions (11,000 positions in Missouri); assembly positions (10, 500 positions in Missouri); and information clerk positions (8,000 positions in Missouri). (Tr. 54-55). Ms. Peters testified that these positions were all compatible with a limited range of light work. (Tr. 55).

Plaintiff's attorney next examined Ms. Peters, who testified that a limitation of less than frequent use of the right hand for fine fingering and feeling would eliminate the hand packaging and assembly positions because these positions require bilateral use of the upper extremities on a frequent basis. (Id.).

Ms. Peters testified that a claimant who missed three unscheduled days a month would be unable to maintain employment. (Tr. 56).

When asked whether a claimant who required a sit/stand option at will could still perform the jobs she previously identified, Ms. Peters responded, "[i]t would still be a limited range of light, no." (Tr. 58).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to Saint Louis ConnectCare on May 8, 2008, with complaints of right shoulder, right knee, and right thigh pain. (Tr. 287). Upon examination, plaintiff had palpable masses over his right shoulder and a swelling, prominent vein over his medial right thigh. (Tr. 289). Further testing was ordered. (Id.).

Plaintiff was admitted at Barnes-Jewish Hospital from May 17, 2008, through May 21, 2008. (Tr. 209). Plaintiff's primary diagnosis at discharge was lung cancer, and his secondary diagnosis was hypertension. (Id.). Plaintiff was initially treated for deep venous thrombosis[10] and pulmonary embolism,[11] although further testing showed no sign of deep venous thrombosis and this treatment was discontinued. (Id.). It was noted that, during plaintiff's pulmonary embolus

---

[10]Formation of one or more thrombi in the deep veins, usually of the lower extremity or in the pelvis; carries a high risk of pulmonary embolism. Stedman's at 1985.

[11]Blockage of the main artery of the lung. See Stedman's at 627.

protocol, imaging revealed a nodule in the right upper lobe concerning for bronchogenic carcinoma. (Id.). Plaintiff underwent a PET scan, which revealed plaintiff's cancer was limited to the lung. (Id.). Plaintiff underwent pulmonary function testing, which revealed no ventilatory defect, and no impairment of gas exchange. (Tr. 231). A CT scan of the head was normal. (Tr. 237). Plaintiff was scheduled to undergo a lobectomy.[12] (Id.). It was noted that plaintiff complained of right shoulder pain, and that a nodule could be felt. (Tr. 210). Plaintiff underwent a right extremity ultrasound, which revealed a right supraclavicular oblong mass in the subcutaneous[13] plane, most consistent with a lipomatous[14] tumor. (Tr. 242). It was recommended that plaintiff undergo an MRI as an outpatient regarding this lipomatous tumor. (Tr. 210). Plaintiff's blood pressure was well-controlled on Hydrochlorothiazide. (Id.). Finally, plaintiff was diagnosed with nicotine dependence, and it was noted that plaintiff wished to discontinue smoking after being diagnosed with lung cancer. (Id.).

Plaintiff underwent a right upper lobectomy and bronchoscopy[15] performed by Alexander Sasha Krupnick, M.D., on June 17, 2008. (Tr. 216-18). A surgical pathology report revealed non-small cell carcinoma. (Tr. 226-27).

Plaintiff underwent pulmonary function testing on June 20, 2008, which revealed that supplemental oxygen could be considered with exercise. (Tr. 222-25).

---

[12]Excision of a lobe of any organ or gland. Stedman's at 1114.

[13]Beneath the skin. Stedman's at 1854.

[14]Manifesting the features of lipoma. Stedman's at 1107.

[15]Inspection of the interior of the tracheobronchial tree through a bronchoscope. Stedman's at 271.

Plaintiff saw Dr. Krupnick on July 17, 2008, at which time plaintiff reported that he was feeling better and that his level of activity had improved. (Tr. 310). On physical examination, plaintiff's lungs were clear to ausculation. (Id.). Dr. Krupnick advised plaintiff to quit smoking to decrease his chance for reoccurrence. (Id.). With regard to plaintiff's musculoskeletal problems, Dr. Krupnick indicated that stretching exercises were necessary after surgery to prevent a frozen shoulder. (Id.).

Plaintiff saw Dr. Krupnick on August 1, 2008, at which time plaintiff still reported occasional complaints of tingling and numbness along the incision site, but he had been able to increase his activities and resume most of his activities of daily living. (Tr. 309). Dr. Krupnick indicated that plaintiff could return to work in two weeks. (Id.). Dr. Krupnick also referred plaintiff to a pain clinic in order to help him manage his cutaneous hypersensitivity. (Id.).

Plaintiff presented to Saint Louis ConnectCare on September 9, 2008, with complaints that he was still experiencing pain. (Tr. 264). Plaintiff was still on home oxygen, and was being followed by Dr. Krupnick at Barnes. (Id.). Plaintiff complained of a painful mass at the right clavicle that he felt moving and growing in size. (Id.). He also complained of painful swelling at the distal medial thigh. (Id.). It was noted that the mass was likely a lipoma, and that it would be monitored for growth. (Id.).

Plaintiff saw Dr. Krupnick on November 7, 2008, at which time he complained of occasional numbness and tingling in his side. (Tr. 308). Dr. Krupnick indicated that plaintiff had not been doing much physical activity in the way of range of motion exercises or stretching with that side. (Id.). Dr. Krupnick noted that he discussed with plaintiff problems associated with disuse of that arm, and encouraged plaintiff to perform exercises. (Id.). Dr. Krupnick indicated

that he would try to obtain a physical therapy consult for plaintiff, although it was difficult to obtain ancillary services approved for plaintiff because he was a ConnectCare patient. (Id.). Dr. Krupnick stated that he had scheduled a pain management consult to help manage plaintiff's residual post-thoracotomy[16] pain. (Id.).

Plaintiff presented to Robert A. Swarm, M.D., Chief, Clinical Pain Management at Barnes-Jewish Hospital, on November 11, 2008, upon the referral of Dr. Krupnick for a consultation regarding management of his right anterior chest pain and right axilla[17] pain. (Tr. 353). Plaintiff complained of pain over his right thoracotomy incision, which was exacerbated by light touch and was worse with straining and physical activity. (Id.). Plaintiff also reported left upper and lower extremity shooting pain, as well as pain in his neck and low back. (Id.). Upon physical examination, Dr. Swarm noted allodynia[18] over the right chest wall, cervical pain on extension and rotation, decreased range of motion of the cervical spine, positive straight leg raise and Patrick's test[19] on the left, and decreased range of motion of the lumbar spine. (Tr. 354). Dr. Swarm's assessment was other chronic pain; right intercostal neuralgia[16]-post thoracotomy pain; cervical spondylosis with left upper extremity radicular symptoms; lumbosacral spondylosis with

---

[16]Incision through the chest wall into the pleural space. Stedman's at 1982.

[17]The area directly under the joint where the arm connects to the shoulder. See Stedman's at 189.

[18]Condition in which ordinarily nonpainful stimuli elicit pain. Stedman's at 52.

[19]A test to determine the presence or absence of sacroiliac disease. See Stedman's at 1957-58.

left lower extremity radicular symptoms.  (Id.).  Dr. Swarm prescribed Gabapentin,[20] Lidoderm patch,[21] and Naproxen.[22]  (Id.).  He ordered x-rays, and referred plaintiff to physical therapy. (Id.).

Plaintiff presented to Saint Louis ConnectCare on December 9, 2008, at which time it was found that plaintiff's soft tissue mass overlying the right clavicle was unchanged compared to the prior exam.  (Tr. 293).  It was noted that plaintiff had developed post thoracotomy pain syndrome and was being followed by Dr. Krupnick and by pain management.  (Id.).  Plaintiff complained of right shoulder pain that shoots down his entire right side, as well as left shoulder pain.  (Id.). Plaintiff indicated that he was unable to lift his arms above shoulder level.  (Id.).  Plaintiff also complained of right knee pain along the medial aspect of his right knee.  (Id.).  Plaintiff's right knee was swollen medially.  (Id.).  Plaintiff was diagnosed with post thoracotomy pain syndrome; and right knee pain and shoulder pain not caused by arterial or venous pathology or by soft tissue masses.  (Id.).  It was noted that x-rays of the spine revealed mild degenerative changes at C5-6, and C6-7, with a normal lumbar and thoracic spine.  (Id.).  Plaintiff was referred to an orthopedist for evaluation of musculoskeletal cause of shoulder and knee pain.  (Id.).  It was noted that plaintiff's post-thoracotomy pain syndrome would be treated by Dr. Krupnick and pain management.  (Id.).

Plaintiff presented to Shawn Zeltwanger, M.D., Fellow, Pain Management at Barnes-

---

[20]Gabapentin is indicated for the treatment of nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited September 4, 2012).

[21]The Lidoderm patch is indicated for the relief of pain associated with post-herpetic neuralgia.  See PDR at 1115.

[22]Naproxen is indicated for the treatment of osteoarthritis.  See PDR at 2633.

Jewish Hospital, on December 16, 2008, with complaints of neck and right shoulder pain.  (Tr. 343).  Plaintiff's pain was largely unchanged since his last visit.  (Id.).  X-rays revealed mild cervical degenerative disc disease at C5-C6 and C6-C7; and normal lumbar and thoracic spinal radiographs.  (Tr. 344).  Dr. Zeltwanger diagnosed plaintiff with other chronic pain; right intercostal neuralgia-post thoracotomy pain; cervical spondylosis with left upper extremity radicular symptoms; and lumbosacral spondylosis with left lower extremity radicular symptoms.  (Tr. 346).  Plaintiff's pain medications were continued, and he was referred to physical therapy.  (Id.).

Dr. Swarm administered a cervical epidural steroid injection on December 16, 2008, due to ongoing neck and upper extremity pain.  (Tr. 341).

Plaintiff presented to Dr. Zeltwanger on March 20, 2009, with complaints of head, upper back, and neck pain.  (Tr. 422).  Plaintiff reported experiencing mostly neck pain, which was worsened with extension, and he still reported right upper extremity pain.  (Id.).  Plaintiff indicated that the epidural steroid injection benefitted him significantly, but it only lasted about one week.  (Id.).  It was noted that plaintiff had been referred to physical therapy on numerous occasions, and that plaintiff indicated that they had never called him.  (Id.).  Plaintiff's diagnoses remained unchanged.  (Tr. 423).  Plaintiff's medications were continued.  (Id.).  Plaintiff underwent a cervical epidural steroid injection at C6.  (Tr. 420).

Plaintiff presented to Brad McPherson, M.D., Fellow, Pain Management at Barnes-Jewish Hospital, on September 25, 2009, with complaints of head pain, and cervical neck pain, right greater than left, which occasionally radiated to the right upper extremity.  (Tr. 388).  Plaintiff had severely decreased cervical range of motion, and axillary pain post lobectomy with significant

tenderness.  (Id.).  Plaintiff had normal range of motion and muscle strength of the upper

extremities.  (Tr. 389).  Plaintiff indicated that he was unable to gain access to medications,

although Tylenol provided some benefit.  (Id.).  Plaintiff was scheduled to start physical therapy

the following day.  (Id.).  Dr. McPherson diagnosed plaintiff with other chronic pain; right

intercostal neuralgia-post thoracotomy pain; cervical spondylosis; and cervicalagia.[23]  (Id.).  Dr.

McPherson emphasized to plaintiff the importance of physical therapy, and continued plaintiff on

Tylenol.  (Id.).  He also indicated that he would try to obtain a supply of Gabapentin.  (Id.).

Plaintiff presented to Dr. McPherson on November 24, 2009, with complaints of right

neck and right occipital headaches.  (Tr. 384).  It was noted that plaintiff had completed physical

therapy with good benefit.  (Id.).  Plaintiff indicated that the headaches occured daily, and the

Gabapentin and Tylenol provided only modest benefit.  (Id.).  Upon examination, Dr. McPherson

noted occipital tenderness to palpation, and paraspinal muscle spasm and decreased range of

motion of the cervical spine.  (Tr. 385).  Dr. McPherson diagnosed plaintiff with other chronic

pain; right intercostal neuralgia-post thoracotomy pain; right occipital neuralgia;[24] cervical

spondylosis; and cervicalagia.  (Id.).  Dr. McPherson scheduled plaintiff for a right occipital nerve

block.  (Id.).

Plaintiff presented to Dr. McPherson on February 1, 2010, with complaints of right-sided

occipital headache.  (Tr. 374).  Upon examination, Dr. McPherson noted occipital tenderness to

---

[23]Pain in the neck.  See Stedman's at 351.

[24]A neurological condition in which the occipital nerves-the nerves that run from the top of
the spinal cord at the base of the neck up through the scalp-are inflamed or injured.  See WebMD,
http://www.webmd.com/migraines-headaches/occipital-neuralgia (last visited September 4, 2012).

palpation on the right. (Tr. 375). Dr. McPherson's diagnosis remained unchanged. (Id.). Dr.

McPherson administered a right occipital nerve block. (Id.). He indicated that, if plaintiff did not

obtain relief, imaging would be necessary to rule out possible metastasis. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since September 24, 2008, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: Degenerative Disc Disease; Non-Small Cell Bronchogenic Carcinoma of the Right Lung (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant needs a sit/stand option every hour.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on December 2, 1958 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act,

since September 24, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 16-20).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on September 24, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).


## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a

(e), 416.920a (e).

## C.    **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in failing to evaluate all of plaintiff's impairments. Specifically, plaintiff contends that the ALJ erred in finding that plaintiff's headaches and right shoulder tumor were not medically-determinable impairments. Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff finally argues that the ALJ erred in relying on vocational expert testimony to determine that plaintiff was capable of performing other work.

The ALJ found that plaintiff's degenerative disc disease and non-small cell bronchogenic carcinoma of the right lung were severe impairments. (Tr. 16). The ALJ acknowledged that plaintiff also alleged disability due to tension headaches and right shoulder tumor. (Tr. 17). The ALJ found, however, that there was "no objective evidence establishing that the claimant suffers from tension headaches or a right shoulder tumor." (Id.). The ALJ thus indicated that plaintiff's alleged tension headaches and right shoulder tumor were not medically determinable impairments, and he would not consider them when assessing plaintiff's RFC. (Id.).

A "medically determinable impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(C)(3). In addition, Social Security Ruling 96-4p states, "[a]lthough the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms

alone."

The undersigned finds that the ALJ erred in determining that plaintiff's headaches and right shoulder tumor were not medically determinable impairments. With regard to plaintiff's shoulder tumor, plaintiff complained of right shoulder pain on May 8, 2008. (Tr. 287). Upon examination, plaintiff had a palpable mass over his right shoulder. (Id.). Plaintiff underwent a right extremity ultrasound on May 17, 2008, which revealed a right supraclavicular oblong mass consistent with a lipomatous tumor. (Tr. 242). In September 2008, plaintiff presented to Saint Louis ConnectCare with complaints of a painful mass at the right clavicle that was growing in size. (Tr. 264). It was noted that plaintiff had been diagnosed with a lipomatous tumor and that the size of the tumor would be monitored. (Id.). On December 9, 2008, plaintiff present to Saint Louis ConnectCare with complaints of right shoulder pain that shoots down his entire right side and indicated that he was unable to lift his arms above shoulder level. (Tr. 293). Plaintiff was referred to an orthopedist for evaluation of a possible musculoskeletal cause of plaintiff's shoulder and knee pain. (Id.). It was noted that plaintiff's post-thoracotomy pain syndrome was being treated by Dr. Krupnick and a pain management physician. (Id.). Plaintiff complained of right shoulder pain at a follow-up visit with pain management physician Dr. Zeltwanger on December 16, 2008. (Tr. 343). Plaintiff underwent an epidural steroid injection at this time due to complaints of neck and upper extremity pain. (Tr. 341). Plaintiff continued to report right upper extremity pain on March 20, 2009. (Tr. 422).

The medical evidence reveals that, contrary to the ALJ's finding, plaintiff was diagnosed with a right shoulder lipomatous tumor in May 2008. (Tr. 242). This diagnosis was based on the findings of an ultrasound plaintiff underwent. (Id.). As such, it was "demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(C)(3). Plaintiff consistently complained of shoulder and right upper extremity pain, and reported that he was unable to lift his arms above shoulder level. (Tr. 293).

Defendant contends that plaintiff's shoulder pain was related to his lung surgery and that the ALJ's finding that plaintiff's cancer was a severe impairment therefore accounted for all the symptoms associated with the cancer, including plaintiff's shoulder pain. The record, however, does not support this finding. Although plaintiff was diagnosed with a right shoulder tumor during his hospitalization for lung surgery, there is no finding in the medical records that the right shoulder tumor was related to plaintiff's lung cancer. Plaintiff's complaints of right shoulder pain were noted separately from plaintiff's complaints of post-thoracotomy pain. Plaintiff received treatment for his right shoulder pain at Saint Louis ConnectCare, while it was noted that plaintiff's post-thoracotomy pain was treated by Dr. Krupnick and pain management physicians.

With respect to plaintiff's headaches, plaintiff complained of head pain to his pain management physicians in March of 2009, and September of 2009. (Tr. 422, 388). On November 24, 2009, plaintiff complained of right occipital headaches that occurred daily, and which were not relived with pain medication. (Tr. 384). Upon examination, Dr. McPherson noted occipital tenderness to palpation. (Tr. 385). Dr. McPherson diagnosed plaintiff with right occipital neuralgia, and scheduled a right occipital nerve block. (Id.). On February 1, 2010, plaintiff continued to complain of right-sided occipital headaches. (Tr. 374). Dr. McPherson again noted occipital tenderness to palpation on the right. (Tr. 375). Dr. McPherson diagnosed plaintiff with right occipital neuralgia, and administered a right occipital nerve block. (Id.).

The medical record reveals that plaintiff was diagnosed with occipital neuralgia after

complaining of headaches occurring daily, which were not relieved with pain medication. This diagnosis was supported by physical examinations, which revealed occipital tenderness. Plaintiff even underwent an occipital nerve block. Defendant contends that plaintiff's headaches were related to his degenerative disc disease in the cervical spine. There is no such finding, however, in the medical record. As such, the ALJ erred in determining that plaintiff's headaches were not a medically determinable impairment.

Further, although defendant contends that the ALJ accounted for plaintiff's symptoms of shoulder pain and headaches, the ALJ specifically stated that plaintiff's tension headaches and right shoulder tumor "will not be considered when assessing the claimant's residual functional capacity." (Tr. 17). It is significant that plaintiff's attorney stated at the administrative hearing that plaintiff was unable to work not due to his breathing impairment, but rather, due to his inability "to use his right side, and the headaches." (Tr. 40). Plaintiff's right shoulder tumor and headaches are medically determinable impairments, and the ALJ's failure to consider these impairments in determining plaintiff's RFC was error. See Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008) (ALJ required to consider the combined effects of both severe and non-severe medically determinable impairments in determining RFC); 20 CFR § 404.1545(a)(2) ("[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe'...when we assess your residual functional capacity").

Plaintiff also argues that the ALJ erred in determining plaintiff's RFC. Plaintiff contends that the RFC formulated by the ALJ is not consistent with the RFC determined by the medical expert at the hearing. Determination of residual functional capacity is a medical question and at

least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant needs a sit/stand option every hour.

(Tr. 17).

The undersigned has found that the ALJ erred in finding that plaintiff's right shoulder tumor and headaches were not medically determinable impairments, and in failing to consider the effect of these impairments on plaintiff's RFC. In addition, as plaintiff notes, although the ALJ indicated that he was giving "controlling weight" to the opinion of the medical expert, Dr. Leigh, the RFC formulated by the ALJ is not consistent with the RFC determined by Dr. Leigh. (Tr. 19, 48). Dr. Leigh found that plaintiff had the residual functional capacity to perform light work, with the following additional limitations: avoid all hazardous unprotected heights; no climbing stairs; occasionally stoop, kneel, crouch, and crawl; occasionally reach overhead with the right upper extremity; avoid concentrated exposure to noxious odors, fumes, gases, dust, smoke, poor ventilation; avoid concentrated exposure to machinery with open, moving parts such as blades; and no commercial driving. (Id.). The ALJ provided no explanation for his decision to exclude the additional limitations found by Dr. Leigh. Significantly, Dr. Leigh is the only physician who expressed an opinion regarding plaintiff's ability to function in the workplace. As such, the RFC formulated by the ALJ is not supported by substantial evidence.

## Conclusion

In sum, the undersigned finds that the ALJ erred in finding that plaintiff's right shoulder tumor and headaches were not medically determinable impairments. The ALJ also erred in determining plaintiff's residual functional capacity. The hypothetical question posed to the vocational expert was based on this erroneous residual functional capacity. Consequently, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider the effect of plaintiff's right shoulder tumor and headaches on plaintiff's residual functional capacity; reassess plaintiff's residual functional capacity based on the medical evidence and, if necessary, obtain additional medical evidence addressing plaintiff's ability to function in the workplace; and obtain vocational expert testimony to determine whether plaintiff is capable of performing other work existing in significant numbers in the national economy with his residual functional capacity. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __24th__ day of September, 2012.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE